Steven N. BRODY, Robert J. Smallacombe and Charles B. Jarrett, Defendants Below, Appellants,

v.

Thomas W. ZAUCHA, Plaintiff Below, Appellee.

No. 242, 1997.

Supreme Court of Delaware.

Submitted: July 16, 1997.
Decided: Aug. 1, 1997.

Andre G. Bouchard (argued), Joel Friedlander, of Lamb & Bouchard, Wilmington (Stuart L. Shapiro, Shapiro & Allen, New York City; Thomas E. Sweeney, Jr., of Sweeney & Associates P.C., Pittsburgh, PA, of counsel), for Appellants.

Martin P. Tully, William M. Lafferty, and S. Mark Hurd, of Morris, Nichols, Arsht & Tunnell, Wilmington (Steven H. Reisberg (argued), Jeffrey B. Finnell, Neil J. Squillante, John Stompor, Willkie Farr & Gallagher, New York City, of counsel), for Appellee.

Before VEASEY, C.J., WALSH and BERGER, JJ.

BERGER, Justice.

Thomas W. Zaucha brought this action, pursuant to 8 *Del. C.* § 225, seeking confirmation that he and his nominees are the directors of Northstar Health Services, Inc. Appellants, three of the ousted Northstar directors, contest the disclosures made during Zaucha's solicitation of written consents as well as the timing of the consent solicitation. The Court of Chancery found no material omissions or misstatements and ruled that the timing of the solicitation was not inequitable. We find that the trial court's decision was supported by the record and we affirm.

I.   Factual and Procedural Background

Zaucha founded the predecessor to Northstar in 1979. Zaucha's company, Keystone Rehabilitation Systems, Inc., was a private company that provided outpatient physical rehabilitation services. Keystone prospered and, in 1991, Zaucha began looking for outside capital. He hired Steven N. Brody, a financial consultant, to assist him. In 1995, Keystone merged with Northstar, a smaller public company, controlled by Mark DeSimone, that provided similar healthcare ser-

vices. Zaucha became the chief executive officer of Northstar and he named himself and Brody to the Northstar board of directors. DeSimone and another pre-merger director continued on the four member Northstar board.

In the Spring of 1996, Northstar's auditor, KPMG Peat Marwick, advised the board that it could not complete its 1995 audit because of concerns about related-party transactions involving DeSimone. Following Peat Marwick's resignation, Northstar's stock price plummeted; the company was delisted by NASDAQ; it defaulted on its bank debt; DeSimone and his associates resigned; and several stockholders started lawsuits. Northstar responded by appointing Brody to investigate DeSimone's alleged mismanagement. The company also retained him as a consultant on the same matter. Brody suggested that Robert J. Smallacombe, a turnaround expert, also be retained as a consultant and be appointed to the Northstar board. The other DeSimone vacancy was filled by David D. Watson, president of Northstar.

The newly constituted board began having problems almost immediately. Zaucha was unable to negotiate a satisfactory consulting contract with Smallacombe and, in August, Zaucha recommended that Northstar not hire Smallacombe. Zaucha was outvoted. Zaucha also unsuccessfully opposed a top level personnel change and he was unable to limit the duration or cost of the Brody investigation. In November 1996, again over Zaucha's objection, the board expanded and appointed two men associated with Brody— Charles B. Jarrett, Jr. and Timothy L. Pesci—as additional directors.

There were other disputes, as well, including questions about the terms of Zaucha's lease agreements with the company. It was the board's decisions at two meetings in January 1997, however, that convinced Zaucha to take action. At the first meeting, on January 15th, the board authorized the issuance of stock options to five senior officers and all board members except Zaucha. The options, *if exercised*, would equal approximately 17% of Northstar's outstanding stock. Following that meeting, Zaucha contacted Common-wealth Associates, an investment banking firm that had worked for Northstar in the past, for advice on conducting a proxy fight. Zaucha also spoke to attorneys at Willkie, Farr & Gallagher, but he decided not to do anything at that time. A few days later, on January 21st, the board adopted bylaw amendments deleting, among other things, bylaws governing the right to call special meetings or take action by written consent.

Zaucha became convinced that he had to act. He retained Commonwealth and Mac-Kenzie Partners, a proxy solicitation firm, and began a solicitation of written consents to (i) remove Brody, Smallacombe and Jarrett as directors and (ii) repeal the recent bylaw amendments. Zaucha delivered his consent to the company on February 5, 1997. Over the next six weeks, Zaucha and the incumbent board engaged in a heated contest for control. The board retained a proxy solicitation firm and budgeted approximately $750,000 to fight Zaucha. Both sides contacted stockholders through mailings, press releases, telephone campaigns and personal visits. On March 24, 1997, Zaucha's proxy solicitor delivered to Northstar's registered agent written consents representing approximately 61% of Northstar's outstanding common stock. The board refused to recognize the consents.

On April 1, 1997, Zaucha filed this action in the Court of Chancery, seeking an order declaring that he and his slate of nominees are the rightful directors of Northstar. Although appellants had filed suit to enjoin the consent solicitation in the Federal District Court for the Western District of Pennsylvania, the parties agreed to dismiss that prior action in favor of the Delaware proceeding. The Court of Chancery held a two day trial in May 1997 and found in favor of Zaucha's slate of directors.

In this appeal, appellants challenge the trial court's finding that Zaucha accurately disclosed all material facts to the Northstar stockholders. Specifically, appellants argue that Zaucha misrepresented or omitted material facts concerning: (i) Zaucha's alleged violations of the federal securities laws; (ii) the reason for Zaucha's termination from Northstar in February 1997; (iii) Common-

wealth's conflict of interest and association with DeSimone; (iv) the dispute over the fairness of Zaucha's rental agreements with Northstar; (v) the options awarded to Brody and Smallacombe in January 1997; and (vi) the integrity of certain board members. Appellants also contend that the Court of Chancery applied the wrong legal standard in addressing the disclosure claims. Finally, appellants complain that the solicitation was inequitably timed to deprive the stockholders of Northstar's audited financial statements, which allegedly were crucial but were not available during the brief time that the solicitation was conducted.

## II. Standard and Scope of Review

■ The issues presented by appellants involve mixed questions of fact and law that are subject to de novo review.[1] The trial court's legal rulings will be affirmed unless there was an error in "formulating or applying legal principles."[2] Its factual findings also will be upheld if they are supported by the record and are the result of an orderly and logical deductive process.[3]

## III. Disclosure Claims

The parties agree that the adequacy of Zaucha's disclosures must be measured by the materiality standard adopted by this Court in *Rosenblatt v. Getty Oil Co.*:

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way,

there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.[4]

■ Appellants maintain that the trial court failed to apply this standard, but we find no merit to this argument. The Court of Chancery expressly held that Zaucha was required "to disclose fully and fairly all material information when he sought shareholder consents," and that "[a] material fact is one that a reasonable investor would view as significantly altering the total mix of information made available."[5] The court cited *Rosenblatt*, as well as more recent decisions following *Rosenblatt*, and it applied settled principles of disclosure law in analyzing each alleged misrepresentation or omission.

Appellants fault the trial court for its concern about practical matters, such as the cost of another consent solicitation in light of the temporary nature of elections. They say that such issues should not have been considered in evaluating the adequacy of the disclosures. We do not agree with appellants' interpretation of the trial court's decision. As we read it, the trial court identified two disclosure questions: (i) whether the disclosures were adequate; and (ii) if not, what form of equitable relief would be appropriate. The court found no disclosure violations and, therefore, did not decide how the practical issues should affect the form of relief. We express no view on this unresolved question. Rather, we confine our analysis to the trial court's findings on the disclosure claims.

### A. Zaucha's Alleged SEC Violations

■ Appellants argue that Zaucha committed three undisclosed violations of the federal securities law when he purchased 75,000 shares of Northstar stock in December 1996: (i) he failed to disclose his intent to

1. *Zirn v. VLI Corp.*, Del.Supr., 681 A.2d 1050, 1055 (1996).

2. *Gilbert v. El Paso Co.*, Del.Supr., 575 A.2d 1131, 1142 (1990).

3. *Arnold v. Society for Sav. Bancorp, Inc.*, Del. Supr., 650 A.2d 1270, 1276 (1994).

4. Del.Supr., 493 A.2d 929, 944 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)).

5. *Zaucha v. Brody*, Del. Ch., C.A. No. 15638–NC, 1997 WL 305841, at *5, Balick, V.C. (June 3, 1997) (internal quotations omitted).

buy the Northstar stock on his Schedule 13D; (ii) he purchased the stock while in possession of material non-public information; and (iii) he failed to file a Form 4 in January 1997, after purchasing the shares. Appellants maintain that Zaucha should have disclosed these alleged securities law violations in his solicitation materials because the stockholders would have considered that information important in deciding whether to vote in favor of Zaucha and his slate of nominees.

■ We find appellants' argument unpersuasive. The record establishes that Zaucha did not realize that he had committed any securities law violations at the time of the consent solicitation.[6] More importantly, Zaucha was never charged with any violations. It is settled Delaware law that a director need not make self-accusatory statements nor engage in "self-flagellation" by confessing to wrongdoing that has not been formally adjudicated by a court of law.[7]

■ On a related matter, appellants complain that Zaucha misrepresented the reason for his termination. The Northstar board voted Zaucha out of office at a board meeting in February 1997, a few days after Zaucha began his consent solicitation. Appellants contend that they ousted Zaucha "for cause" upon discovery of his securities law violations, but Zaucha told the stockholders that his removal was "retaliation from a desperate board." The trial court noted that the press release issued in connection with Zaucha's termination never mentioned the alleged securities law violations, and concluded that Zaucha had "no duty ... to adopt his opponents' current explanation of why he was removed...."[8] The trial court's ruling was correct both as a matter of fact and law.

### B. Commonwealth's Alleged Conflict of Interest

■ Appellants accuse Zaucha of falsely reporting to the stockholders that "Commonwealth has assured me that it has had no business dealings with DeSimone since his resignation." According to appellants, a Commonwealth employee told Zaucha in May 1996 that Commonwealth was representing a public company founded by DeSimone. In light of the fact that Northstar had taken legal action against DeSimone and was considering legal action against Commonwealth, appellants argue that Zaucha's statements concerning Commonwealth's relationship with DeSimone materially misled Northstar's stockholders.

This claim also fails. Commonwealth's purported involvement in DeSimone's wrongdoing, as explained by the Court of Chancery, amounted to nothing more than suspicions and accusations. No formal charges were brought against Commonwealth; at most, the board was investigating a possible suit against Commonwealth. Zaucha had no obligation to disclose either the board's suspicions of wrongdoing or the possibility of legal action.[9] Moreover, the record does not support appellants' claim that Zaucha's statement to the stockholders was inaccurate. While it may be that Commonwealth at one time represented a company associated with DeSimone, there is no evidence that Zaucha was ever privy to such information.

### C. Other Alleged Disclosure Violations

■ Appellants' remaining disclosure claims also lack merit. First, they contend that Zaucha should have disclosed that he and the board were engaged in a dispute regarding the rents that he was charging Northstar. Zaucha fully disclosed his lease arrangements with Northstar, including the

**6.** Zaucha still does not believe that his stock purchase violated federal securities laws governing insider trading. He does acknowledge that he made a mistake in not amending his Schedule 13D and filing a Form 4 until early February 1997, when his oversight was pointed out. Zaucha's statements are characterized by appellants as "admitted violations of law," but neither Zaucha nor the trial court was required to adopt appellants' spin on the facts.

**7.** *Stroud v. Grace,* Del.Supr., 606 A.2d 75, 84 n. 1 (1992); *Margolies v. Pope & Talbot, Inc.,* Del. Ch., C.A. No. 8244, 1986 WL 15145, at *7, Hartnett, V.C. (Dec. 23, 1986).

**8.** *Zaucha,* 1997 WL 305841, at *7.

**9.** *Stroud,* 606 A.2d at 84 n. 1; *Margolies,* 1986 WL 15145, at *7.

origin of the transactions, the price Zaucha paid for the properties and the amount of rent he receives. Zaucha was under no obligation to disclose the board's view of the fairness of the lease terms or the actions the board may have been contemplating.[10]

Second, appellants argue that Zaucha unfairly attacked the integrity of board members Jarrett and Pesci by accusing them of "engag[ing] in a continuous pattern of self-dealing and self-enrichment to the neglect of the interests of stockholders." In fact, Zaucha never singled out Jarrett or Pesci. He stated that the board, as a whole, had engaged in that conduct. The record establishes that the board did approve a number of self-dealing transactions. Thus, Zaucha's statement was not factually inaccurate.

■ Third, appellants argue that Zaucha's solicitation materials misrepresented and omitted significant facts concerning the 400,-000 options allocated to Brody and Smallacombe. According to appellants, Zaucha mischaracterized the options as "bargain-priced" and "excessive," even though he himself had approved some of them and had acknowledged that the $1.75 option price, approved by the board's independent investment banking firm, was consistent with the fair market value of the shares. Appellants also complain that Zaucha failed to disclose that 150,000 of the 400,000 options were subject to strict vesting conditions.

We conclude that Zaucha did not commit any disclosure violations regarding the options. Again, Zaucha was under no obligation to disclose the board's expert opinion as to the fair market value of the options and he did disclose that he had voted in favor of certain options. Zaucha's failure to disclose that 150,000 of the 400,000 options were subject to certain vesting conditions was not, under the circumstances, a material omission. The stockholders were voting on a slate of directors. The details of how and when cer-

tain options would vest would not have been important to their decision.

## IV. Timing of the Consent Solicitation

■ Appellants argue that, by timing the consent solicitation as he did, Zaucha deprived the Northstar stockholders of financial information that was crucial to their decision. They say that Zaucha purposely timed the consent to end on March 21, 1997—ten days before the board could send out Northstar's 1995 and 1996 audited financial statements and its revocation of consent cards. Relying on *Schnell v. Chris–Craft Industries, Inc.*,[11] appellants contend that Zaucha's consent should be set aside as inequitable.

In *Schnell*, this Court held that "inequitable action does not become permissible simply because it is legally possible."[12] The cases following *Schnell* explain that a fiduciary may not exercise legal rights if the action is inequitable either in its purpose or effect.[13] We conclude that Zaucha did not misuse his statutory right to a consent solicitation to gain control of Northstar's board.

First, the Court of Chancery found that Zaucha did not act out of any improper motivation when he initiated or concluded the consent solicitation:

Mr. Zaucha began his consent solicitation in response to specific actions by an appointed board that had never held a stockholder meeting. I accept his testimony that he was not aware of the effect of Northstar's failure to file a Form 10–K and that the timing of his solicitation had nothing to do with resulting restrictions on the company. I further accept the uncontroverted testimony of Mr. Zaucha's proxy solicitor, Daniel Burch, that he set the date for the conclusion of the solicitation based on a typical six-week timetable for such an undertaking without any knowledge of Northstar's problems or plans with regard to audited financial statements.[14]

---

10. *Stroud,* 606 A.2d at 84 n. 1; *Margolies,* 1986 WL 15145, at *7.

11. Del.Supr., 285 A.2d 437 (1971).

12. *Id.* at 439.

13. *See Stahl v. Apple Bancorp, Inc.,* Del. Ch., 579 A.2d 1115, 1121–22 (1990); *Lerman v. Diagnostic Data, Inc.,* Del. Ch., 421 A.2d 906, 912–14 (1980).

14. *Zaucha,* 1997 WL 305841, at *3.

The Court of Chancery, as the trier of fact, was best able to judge the credibility of the witnesses and its decision to accept the testimony of Zaucha and his proxy solicitor will not be disturbed on appeal.[15]

We also are satisfied that the timing of the solicitation did not achieve an inequitable result. The solicitation deadline did require the stockholders to act before receiving Northstar's audited financial statements and the board's revocation of consent cards. But the audited financial statements were not what this consent solicitation was about. As the trial court noted, the financials would not have been particularly helpful in evaluating the issues of corporate governance and executive compensation that were the focus of the consent solicitation. With respect to the revocation of consent cards, although none were distributed, the stockholders were informed of their right to revoke in the materials circulated by both sides.

### Conclusion

Based on the foregoing, we affirm the Court of Chancery's order declaring Zaucha and his slate of nominees the lawful directors of Northstar.

---

15. *Wife (J.F.V.) v. Husband (O.W.V., Jr.),* Del. Supr., 402 A.2d 1202, 1204 (1979).