Kenneth WEISS, Plaintiff,

v.

SAMSONITE CORPORATION, R. Theodore Ammon, Bernard Attal, Leon D. Black, Robert H. Falk, Richard R. Nicolosi, Mark H. Rachesky, Robert L. Rosen, Marc J. Rowan and Steven J. Solarz, Defendants.

Civil Action No. 16503.

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 4, 1999.
Decided: June 14, 1999.

Ronald A. Brown, Jr., of Prickett, Jones, Elliott & Kristol, Wilmington, Delaware; and Arthur T. Susman, of Susman & Watkins, Chicago, Illinois, for Plaintiff.

Rodman Ward, Jr., and Stephen D. Dargitz, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, for Defendants.

## OPINION

JACOBS, Vice Chancellor.

Under challenge in this action is an internal leveraged recapitalization (the "Recapitalization Plan" or "Plan") of Samsonite Corporation, a Delaware corporation ("Samsonite" or the "Company"), which occurred in June 1998. The Recapitalization Plan took the form of a cash self-tender offer by Samsonite to acquire 51% of its common stock at $40 per share. It was not in response to a hostile tender offer, nor was it a "going private" transaction. The Plan was made available to all Samsonite stockholders on an equal and ratable basis, and was highly successful in that 97.4% of the outstanding shares were ultimately tendered.

The plaintiff, a Samsonite shareholder, brought this action attacking the Plan on two grounds: (a) the Plan was wrongfully coercive, and (b) the Samsonite Board failed to disclose all material information for the stockholders to make an informed investment decision whether or not to tender. The defendants (Samsonite and the members of its Board) and the plaintiff have both filed cross-motions for judgment on the pleadings. This is the decision of the Court on those motions. For the reasons now set forth, I conclude that the defendants' motion should be granted and that the plaintiff's motion should be denied.

## I. BACKGROUND

The facts recited below are drawn from the pleadings. During the latter half of 1997, Samsonite's Board of Directors began exploring ways to maximize shareholder value by means of an extraordinary transaction such as a recapitalization, business combination, or a sale of the Company. The Board directed the Company's financial advisor, Goldman Sachs & Company, to explore these various alternatives. During the final quarter of 1997, Goldman Sachs solicited "indications of interest" from potential acquirors that the Board had identified.

On March 6 and March 20, 1998, the Board met with Samsonite's management and its legal and financial advisors to review Goldman Sachs' solicitation efforts. Although Goldman Sachs had received several preliminary indications of interest from various third parties, only one acquisition proposal had materialized. That proposal—to acquire all of Samsonite's stock at $35 per share in a stock-for-stock deal—was highly conditional and subject to due diligence. Although discussions were held between the potential acquiror and the Company, no agreement was reached and eventually the proposal was withdrawn and the discussions were terminated.

At its March 6 and March 20, 1998 meetings, the Board also considered three other alternatives: (i) a recapitalization involving the payment of a $12.50 per share cash dividend to all shareholders; (ii) a "sponsored recapitalization" wherein outside investors would purchase newly issued stock representing approximately 50% of the Company's equity, and the existing stockholders would receive $30 per share in cash and retain a diluted (yet substantial) equity interest; or (iii) taking no action. Ultimately, the Board approved exploring a recapitalization that would involve a $12.50 per share cash dividend, it being understood that the transaction could be abandoned at any time.

Thereafter and through April 1998, Samsonite's representatives held discussions with third parties about a potential sponsored recapitalization. One financial investor made a preliminary proposal that would have enabled Samsonite to pay about $30 per share in cash to its existing stockholders, who would end up owning about 50% of the total equity. This transaction would be financed by Samsonite taking on additional debt and selling newly issued equity to the financial investor. The problem was that the proposal was subject to certain equity "adjustments" that the Company's advisors believed would reduce the stockholders' equity ownership percentage significantly below the 50% benchmark.

Because that prospect was unacceptable, the Board began developing a leveraged internal recapitalization plan in which Samsonite would make a partial self tender offer to acquire its own shares at a substantial premium. That concept ultimately evolved into the Recapitalization Plan at issue here. The objective of the Plan was to return a substantial amount of cash to stockholders. That objective would be accomplished by a self-tender offer to all stockholders on an equal, ratable basis to acquire approximately 51% of the Company's shares at a net price of $40 per share cash (the "Offer").[1] The $40 per share price represented a 33% premium above the then-current market price of the Company's shares. To finance the $40 per share cash payment the Company would take on substantial new debt.

At a May 6, 1998 Board meeting, Samsonite's Board and its legal and financial advisors and management discussed in detail the terms, conditions, and consequences of the Recapitalization Plan; the payment of a $12.50 dividend; the status of the sponsored recapitalization proposal; and the alternative of not pursuing any transaction. The Board decided that the earlier-described sponsored recapitalization proposal, after factoring in the proposed equity "adjustments," would deliver less total value to shareholders, and pose a substantially higher risk of nonconsummation, than would the Recapitalization Plan. Accordingly, the Board decided not to pursue the sponsored recapitalization plan.

Instead, the Board focused its attention to the financing that would be needed to carry out the Recapitalization Plan. On that subject the Board was advised that Samsonite expected to receive assurances in the form of commitments from credit facility banks, a "highly confident" letter[2] with respect to a proposed offering of senior subordinated notes, and an underwriting commitment for a proposed offering of senior preferred stock units. Goldman Sachs also advised the Board on several other issues, including (i) the relevant financial ratios after giving effect to the Plan, (ii) the terms of the senior subordinated notes and senior preferred stock units, (iii) variables that might affect trad-

---

1. 51% ultimately became the target percentage in the Plan as amended on June 9, 1998. Originally, it was contemplated that 12 million shares (or 59%) would be purchased, but as a result of the amendment, that number was reduced to 10 million, or 51%.

2. Meaning that the company would be given strong assurances that the Senior Subordinated Notes would sell on the market, usually within a specified price range.

ing prices of Samsonite stock after the Plan was consummated, and (iv) comparable public company data that suggested a range of prices at which the Company's stock might trade in both the near and long term.[3]

Additional Board meetings were held on May 7, 11, and 12, 1998, at which the directors discussed the Recapitalization Plan and the status of the financing terms which were still being negotiated. Ultimately, the Board obtained financing from several sources: private placements of $350 million aggregate principal amount of Senior Subordinate Notes and of $175 million of Senior Preferred Stock, and a new $300 million bank credit facility. Having put the financing into place, the Board then determined that the Recapitalization Plan was fair to and in the best interests of Samsonite and its shareholders, and resolved that the Plan should go forward.

On May 20, 1998, Samsonite sent an Offer to Purchase to all its stockholders. The Offer to Purchase prominently disclosed that: (i) in management's view, stockholders should tender 100% of their shares to maximize the value of their holdings and ensure the success of the Plan, (ii) the offering price would be $40 per share cash, and (iii) the premium being offered for the tendered shares would likely reduce the post-tender trading price of the shares remaining after the Offer. The Offer to Purchase also disclosed other information that would be useful to shareholders attempting to decide whether or not they should tender, such as: (a) the market price of the Company's common stock on the day after the announcement of the Plan, (b) the price range of the shares for the two preceding years and for the period from January 1 through May 14, 1998, and (c) information about the third-party acquisition offer that had fallen through. The Offer to Purchase also set forth historical financial information for the four fiscal quarters ending January 31, 1999, as well as Company forecasts for the five fiscal years ending January 31, 2003. Those forecasts showed that at least for the short-term, the Company's United States wholesale business would be depressed.

Approximately 97.4% of the outstanding shares were tendered into the Offer, which was completed on June 24, 1998. Under the proration terms of the Offer, the Company accepted 51% of the tendered shares on an equal and ratable basis.

\*     \*     \*     \*     \*     \*

On July 1, 1998, the plaintiff filed this action, both individually and on behalf of a class of all common stockholders who owned Samsonite common stock during the pendency of the Offer, excluding the defendants and their affiliates. The complaint alleges that the Offer was wrongfully coercive, and that in approving the Plan the defendants had committed various breaches of fiduciary duty and violations of Delaware law, including equitable fraud and duty of disclosure violations.

## II.  THE CONTENTIONS

In support of their motion for judgment on the pleadings, the defendants argue that there is no basis under Delaware law to hold that a pro-rata leveraged recapitalization of a corporation constitutes a breach of the directors' fiduciary duty where, as here, the recapitalization is not a "going private" transaction or a defensive response to a hostile takeover bid. All that occurred in this case, defendants contend, was that the Board decided to distribute cash to stockholders and to finance that distribution by a sale of debt securities and preferred stock. That decision, the defendants insist, was a matter of directorial business judgment, as was the Board's decision to structure the transaction as a self tender. The defen-

---

3.  A Valuation Research Corporation ("VRC") representative also advised the Board that, in VRC's opinion, the value of Samsonite's as- sets after consummation of the Recapitalization Plan would exceed its liabilities.

dants argue that because the transaction was approved by an unconflicted and fully informed board that had thoroughly analyzed both the proposed transaction and the available alternatives before making its business judgment, the pleadings do not state a cognizable claim for relief.

The plaintiff responds that his complaint states legally sufficient claims that the Offer was coercive, substantively unfair, and involved duty of disclosure violations.[4] He claims that the Recapitalization Plan was coercive and unfair because the market premium embodied in the Offer was intended to (and did) compel Samsonite shareholders to tender their shares. He alleges that the disclosures in the Offer to Purchase were deficient, because that document did not disclose the Board's "methodology" for setting the Offer price, the basis for its determination that the Offer price was fair, and the "total value" of the Offer.

### III. ANALYSIS

■ Under Court of Chancery Rule 12(c), this Court will grant a motion for judgment on the pleadings only where there are no material issues of fact and the movant is entitled to judgment as a matter of law.[5] On a Rule 12(c) motion the Court takes the well-pleaded facts alleged in the complaint as true, and views those facts and any inferences drawn therefrom in the light most favorable to the non-moving party.[6]

I analyze the plaintiff's claims in accordance with these standards.

### A. The Wrongful Coercion Claim

■ Neither side disputes that the Offer was "coercive" in the sense that the 33% market premium embodied in the $40 per share price was intended to—and did—induce the stockholders to tender their shares. The dispute is about whether the complaint states a claim that the Offer was wrongfully or actionably coercive. That issue requires addressing the two critical Board business decisions that comprised the Plan. The first was the decision for the Company to take on substantial increased debt. The second was the decision to distribute to the Samsonite shareholders the cash generated as a result of assuming that debt. The specific legal issue is whether these decisions, viewed singly and collectively, are entitled to business judgment rule protection as a matter of law. I conclude that they are, for which reason the complaint fails to state a legally sufficient claim that the Offer was wrongfully coercive.

As earlier noted, in 1997 the Board determined to "enhance shareholder value," and over the next several months, explored alternative ways to accomplish that goal, including paying an extraordinary dividend and conducting a partial self tender at a substantial above-market premium. In today's financial world, dividends and self-tender offers are viewed as conventional methods of delivering to shareholders a return on their investment.[7] The transactional choices the Board made here—to assume debt and conduct a cash self-tender offer—were classic business judgment decisions of the kind that are normally

---

4.  The plaintiff has moved for partial judgment on the pleadings with respect to his disclosure claims. This Opinion rules on that motion as well.

5.  *Desert Equities v. Morgan Stanley Leveraged Equity Fund,* Del.Supr., 624 A.2d 1199, 1205 (1993).

6.  *Id.*

7.  *See* Richard A. Brealey & Stewart C. Myers, *Principles of Corporate Finance* 359 (3d ed. 1988) ("When a firm wants to pay cash to its

stockholders, it usually declares a cash dividend. But an alternative and increasingly popular method is to repurchase its own stock ... [O]ne method [of repurchase] is by a general tender offer either to all shareholders or just to small shareholders."); Marcel Kahan, *Anti–Dilution Provisions in Convertible Securities,* 2 Stan. J.L. Bus. & Fin. 147, 155 (1995) ("Dividends and self-tender offers are alternative routes for distributing cash to the shareholders.").

protected by the business judgment rule.[8] Only if facts are pleaded that, if true, would rebut the business judgment rule presumption, would those decisions be subject to challenge.[9]

In this case, no facts are pleaded that would displace the protection of the business judgment rule. The plaintiff does not allege that the Board's decision caused or threatened a change in control of the Company or materially diluted the percentage of the shareholders' equity ownership interests. Nor does he allege that the Board's decision was not made in good faith or with due care. His challenge appears to go to whether the Board's decision to structure the transaction in the chosen manner was proper. But that is not for this Court to decide, because questions concerning the structure of a transaction, or what the resulting debt to equity ratio of the firm should be, are reserved to the board.

The plaintiff contends that his claim that the Offer "coerced" shareholders into tendering is sufficient, without more, to state a valid claim. That cannot be correct, because the relevant question is not whether a tender offer is coercive, but whether it is actionably coercive. A tender offer that is "actionably" or "wrongfully" coercive is one that either (i) threatens to extinguish or dilute a percentage ownership interest in relation to the interest of other stockholders;[10] or (ii) induces shareholders who were the victims of inequitable action to tender for reasons unrelated to the economic merits of the offer.[11] The complaint alleges neither scenario. "[A]n offer that is economically 'too good to resist' as compared to the alternative of not tendering, would not, for that reason alone, be actionably coercive."[12]

Nor do *Paramount Communications, Inc. v. QVC Network, Inc.* or *Kahn v. U.S.*

---

**8.** *See* 8 *Del. C.* § 141(a); *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 872 (1985); *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 811 (1984); *see also Kahn v. Tremont Corp.*, Del. Ch., C.A. No. 12339, 1996 WL 145452, mem. op. at 48, Allen, C. (Mar. 21 *revised* Mar. 27, 1996) ("a decision to approve a particular form of investment goes to the heart of the business judgment of directors."), *rev'd on other grounds*, Del.Supr., 694 A.2d 422 (1997); *AC Acquisitions Corp v. Anderson, Clayton & Co.*, Del. Ch., 519 A.2d 103, 111 (1986) ("Ordinarily when a court is required to review the propriety of a corporate transaction challenged as constituting a breach of duty or is asked to enjoin a proposed transaction on that ground, it will, in effect, decline to evaluate the merits of wisdom of the transaction once it is shown that the decision to accomplish the transaction was made by directors with no financial interest in the transaction adverse to the corporation and that in reaching the decision the directors followed an appropriately deliberative process."); *In re J.P. Stevens & Co. Shareholders Litig.*, Del. Ch., 542 A.2d 770, 780 (1988) ("Stated generally, the business judgment rule provides that a decision made by an independent board will not give rise to liability ... if it is made in good faith and in the exercise of due care.").

**9.** *Unocal Corp. v. Mesa Petroleum Co.*, Del. Supr., 493 A.2d 946, 958 (1985) (holding that to rebut presumption it must be shown by a

preponderance of the evidence that board's decision involved a breach of fiduciary duty, such as fraud, overreaching, lack of good faith, being uninformed, or entrenchment).

**10.** *See e.g. Paramount Communications, Inc. v. QVC Network, Inc.*, Del.Supr., 637 A.2d 34, 48 n. 18 (1994) (involving two-tier, front-end loaded tender offer that was identified as "coercive" and "inherently problematic"); *Kahn v. U.S. Sugar Corp.*, Del. Ch., C.A. No. 7313, 1985 WL 4449, Hartnett, V.C. (Dec. 10, 1985) (involving leveraged buyout that affected percentage ownership interests because shareholders were faced with a choice of either selling out *entirely*, or holding onto shares with knowledge that their price would decline below the offer price).

**11.** *See e.g., Eisenberg v. Chicago Milwaukee Corp.*, Del. Ch., 537 A.2d 1051, 1056 (1987) (holding that coercion is present only when the defendants' actions "operate inequitably to induce the ... shareholder to tender their shares for reasons unrelated to the economic merits of the offer.").

**12.** *Lieb v. Clark*, Del. Ch., C.A. No. 9012, 1987 WL 11903, mem. op. at 12, Jacobs, V.C. (June 1, 1987) (quoting *Macfadden Holdings, Inc. v. John Blair & Company*, Del. Ch., C.A. No. 8489, 1986 WL 7356, mem. op. at 14, Jacobs, V.C. (July 2, 1986)).

*Sugar Corp.,*[13] upon which the plaintiff relies, support his position. In those cases the challenged tender offers threatened to affect adversely the stockholders' relative ownership interests. But in this case, tendering Samsonite shareholders, upon completion of the Offer, would continue to own their equity interest in the company in virtually the same percentages as before. They were not being cashed out, and no stockholder would materially increase his or her ownership percentage in relation to the others. The plaintiff repeatedly protests that Samsonite stockholders were selling "half of their shares," but the protest ignores the *pro rata* effect of the Offer, which enabled all tendering stockholders to retain virtually the identical ownership percentage as before while at the same time receiving the economic equivalent of an extraordinary dividend.

*Eisenberg v. Chicago Milwaukee Corp.*[14] is not useful precedent here either. In that case, the offering statement issued in connection with a corporate self-tender disclosed that after the completion of the offer, management would delist the shares of shareholders who did not tender. Those disclosures were found to be wrongfully coercive, because the shareholders were in effect being told that if they did not tender they would have no reliable market for their shares. Here, the plaintiff alleges no post-Offer threatened act that could be construed as inequitable.

■ The plaintiff further argues that the Plan was wrongfully coercive because the post-tender market price per share would likely decrease. But that fact does not render the Plan invalid. The offering materials clearly disclosed that the post-Offer market price of the shares was expected to be substantially lower than the tender offer price and market price prevailing on the date of the Offer.[15] As Vice Chancellor Berger held in *Cottle v. Standard Brands Paint Co.,*[16] a partial self-tender offer at a market premium is not *per se* actionably coercive, "even if paying that premium may adversely affect the market value of the remaining outstanding shares, *provided that the offering materials make full disclosure of such an adverse effect.*"[17]

■ Finally, the plaintiff contends that the Plan was wrongfully coercive because the effect of the large cash payment would hinder the Company's ability to pay ordinary dividends in the future. Again, that does not state a legal claim, because the argument boils down to the assertion that the Board made a bad or shortsighted decision concerning how to deploy the company's cash. The wisdom or merit of a business decision of that kind is not (to repeat) a proper subject for judicial review.

■ The Offer as described in the pleadings was not wrongfully "coercive." It gave all Samsonite stockholders an equal opportunity to participate on an equal and ratable basis. No stockholder or anyone else received any consideration or other interest that was not available to all other stockholders in the Company. All shares that the company acquired in the Offer became treasury shares. From a purely functional, economic point of view, the Plan was identical to an extraordinary dividend, and the Board's decision to approve it was manifestly a business judgment matter. Because no facts have been alleged that would render the business judgment standard of review inapplicable, the wrongful coercion claim must be dismissed.

13. *See supra* note 10.

14. *See supra* note 11.

15. *See e.g.,* Offer to Purchase, cover page, 2, 9, and 10.

16. *Cottle v. Standard Brands Paint Co.,* Del. Ch., C.A. Nos. 9342, 9405 & 9151, 1990 WL 34824, *mem. op.* at 8, Berger, V.C. (Mar. 22, 1990).

17. *Id.* (emphasis added).

## B. The Disclosure Claim

The plaintiff also alleges duty of disclosure claims. It is well established that as directors of a Delaware corporation, the Samsonite Board members had a fiduciary duty honestly to provide full and fair disclosure of all material facts relating to the proposed Offer.[18] In this case, it is not claimed that any disclosure was misstated; rather, the claim is that certain facts were omitted. For an "omission" claim to succeed, the plaintiff must establish that the omitted fact was material. Specifically, the plaintiff must show a substantial likelihood that the omitted facts, if disclosed, would have "significantly altered the 'total mix' of information" available to the stockholders, and would therefore have assumed actual significance in a reasonable stockholder' deliberations.[19]

A stockholder faced with a partial self tender offer will normally have three options. The stockholder must decide whether or not to (a) tender the shares into the offer; (b) sell the shares on the open market; or (c) retain the shares. In that context the stockholder must be apprised of all available information that is material to that decision.[20]

The issue presented on this claim is whether the Offer to Purchase provided the Samsonite shareholders all information material to such a decision. The plaintiff claims that it did not, because that disclosure document omitted to disclose the methodology the Board used to arrive at the $40 Offer Price, and the Board's assessment of the "total value" of the Recapitalization plan (which the Board used as a basis to reject or pursue alternative transactions). The defendants contend, and I agree, that those omitted facts were not material, because the disclosures made in the Offer to Purchase contained adequate information to enable the Samsonite shareholders to make an informed investment decision.

The Offer to Purchase disclosed the material facts that Samsonite shareholders needed to evaluate the Offer for several reasons. First, the three most critical pieces of information were disclosed: (i) the $40 Offer price, (ii) the potential depressing effect of the partial self-tender on the post-tender market price of the shares, and (iii) the need for stockholders to tender all their shares to assure that the Plan would succeed—*i.e.*, that all shareholders would receive the $40 Offer price and still

---

18. *See Malone v. Brincat*, Del.Supr., 722 A.2d 5 (1998) (holding that "when directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty."); *Stroud v. Grace*, Del.Supr., 606 A.2d 75 (1992); *Weinberger v. U.O.P., Inc.*, Del.Supr., 457 A.2d 701 (1983).

19. *Arnold v. Society For Savings Bancorp*, Del. Supr., 650 A.2d 1270, 1276 (1994) (citations omitted); *see also Loudon v. Archer–Daniels–Midland Co.*, Del.Supr., 700 A.2d 135, 143 (1997) (for plaintiffs to succeed, they must show a substantial likelihood that "the disclosure of the omitted fact would have been viewed by the reasonable stockholder as having significantly altered the 'total mix' of information made available."); *Solomon v. Armstrong*, Del. Ch., C.A. No. 13515, 1999 WL 182569, mem. op. at 73, Chandler, C. (March 25, 1999) ("A faulty disclosure claim must establish a 'substantial likelihood, that under all the circumstances, the omitted fact would have assumed actual significance in the delib-

erations of the reasonable stockholder.' " (quoting *Loudon*, 700 A.2d at 143)); *Sonet v. Plum Creek Timber Company*, C.A. No. 16931, 1999 WL 160174, mem. op. at 19, Jacobs, V.C. (March 18, 1999) (*"Sonet II"*) (citing *Arnold*). In some circumstances, misleading partial disclosures may also constitute a material omission or misstatement. *Arnold*, 650 A.2d at 1276.

20. *Frank v. Arnelle*, Del. Ch., C.A. No. 15642, 1998 WL 668649, mem. op. at 4–5, Chandler, C. (Sept. 16, 1998); *aff'd*, Del.Supr., 725 A.2d 441 (1999) (clarifying that Court of Chancery opinion must be read to imply that directors are obligated to disclose material information to a stockholder's decision whether to hold or dispose of shares); *see also Brody v. Zaucha*, Del.Supr., 697 A.2d 749, 753 (1997); *Zirn v. VLI Corp.*, Del.Supr., 681 A.2d 1050 (1996); *Lynch v. Vickers Energy Corp.*, Del.Supr., 383 A.2d 278 (1977); *Cottle v. Standard Brands Paint Co.*, Del. Ch., C.A. Nos. 9342 & 9405, 1990 WL 34824, Berger, V.C. (Mar. 22, 1990).

retain their same relative equity percentage ownership in the company. As previously discussed at page 370, *supra,* the Offer to Purchase also disclosed substantial additional information that the shareholders would have found useful in making their decision. This information, taken as a whole, was amply sufficient to enable Samsonite's shareholders to evaluate the Offer and make an informed decision whether or not to tender their shares.

But, the plaintiff insists, for the shareholders' decision to be properly informed, the Board was required to disclose other information, specifically the reasoning or "methodology" the Board used to select the $40 self tender price, and its calculation of "total value." I remain unpersuaded that the disclosure of those facts would have altered the total mix of information made available to the shareholders. To reiterate, the stockholders needed to decide whether to hold, tender their shares, or sell them on the market. The facts that were disclosed enabled them to assess the price they were being offered, the market's reaction to the Offer, and whether or not tendering into the Offer would make the best investment sense from their particular perspective.[21] How the $40 number was arrived at in this circumstance, where the shareholders would retain their relative equity interest, would make no more difference that it would had the Board simply declared a $40 extraordinary dividend. The same reasoning applies to a disclosure of the Board's assessment of the "total value" of the Offer.

The plaintiffs argue, based on *Frank v. Arnelle,* that because the Board claimed or implied in the Offer to Purchase that the $40 per share Offer price was "fair," Delaware law required the Board to disclose

"why and how" that price was selected in order "to ensure a balanced presentation."[22] But the Offer to Purchase, when read, shows that the Board's fairness assessment related to the overall transaction, not just the Offer price alone. Moreover, a reasonable Samsonite stockholder would have understood from the Offer to Purchase that the $40 tender offer price was market driven, rather than the product of an effort to determine a "fair value" price range for Samsonite stock.[23]

▮ Finally, the disclosure violation claim fails because the complaint does not plead a causal connection between the omissions and any damages sustained.[24] The damages claim is that the Company incurred debt to fund the Offer, which drove down the price of the stock, and that as a result the stockholders ended up with cash and stock worth at least $2 to $3 per share less than the total value they had immediately before the Offer. That $2 to $3 damage figure is the plaintiff's own damage estimate, arrived at as follows: because the stockholders received $40 per share for half of their stock, and were left holding a "stub security" worth about $12, the "total value" of the self tender offer was at most $26 per share.[25] Because Samsonite shares were trading at approximately $29 per share before the Offer was announced, the plaintiff concludes that the shareholder class was injured to the extent of $2 to $3 per share.

The infirmity in this argument is demonstrated by the following table of the closing prices of Samsonite stock on the NASDAQ National Market System between May 19 and June 25, 1998, of which the Court takes judicial notice:[26]

---

**21.** It appears that most shareholders believed that it would: an overwhelming percentage (97.4%) of shareholders voted to receive a $40 cash per share payment for 51% of their shares.

**22.** *Frank, supra* note 20, at 13.

**23.** *Id.* at 14.

**24.** *Loudon v. Archer–Daniels–Midland Co.,* Del.Supr., 700 A.2d 135, 141–43 (1997).

**25.** Calculated by the plaintiff as follows: ($40 cash + a stub security having an initial market value of $12) ÷ 2 = $26.

5/19: 28-7/8    5/26: 29-1/8    6/1: 28-11/16
5/20: 29-1/4 [27]    5/27: 28-9/16    6/2: 28-3/4
5/21: 29-5/16    5/28: 28-9/16    6/3: 28-7/8
5/22: 29-1/16    5/29: 28-3/4    6/4: 28-7/8
6/5: 29

6/8: 28-9/16    6/15: 24-3/16    6/22: 25-5/16
6/9: 26-7/8 [28]    6/16: 23-1/2    6/23: 25-5/8
6/10: 25-5/8    6/17: 24-5/8    6/24: 12 [29]
6/11: 25-1/4    6/18: 25    6/25: 12-3/16
6/12: 24-11/16    6/19: 25-3/8

The flaw in the plaintiff's reasoning is that he compares the post-Offer market price ($12) to the $29-1/4 market price that prevailed at the time of the original self tender on May 20. But the comparison is incorrect, because on June 9 the offer was amended. Accordingly, the only relevant comparison would be to the amended Offer. The market price of the Samsonite shares on June 9, the day of the amendment, was $26-7/8. If that $26-7/8 value is used, a $12 "stub" price would be completely consistent with an offering price of $40 per share.[30] To express it differently, when the relevant market prices are compared, the complaint reveals no damage resulting from the disclosure omission.

Moreover—and contrary to the plaintiff's argument that the debt incurred to fund the Offer drove down the price of the stock—the table also shows that during the pendency of the Offer Samsonite's stock price remained relatively stable and close to its pre-Offer level until the June 9 amendment which reduced the maximum number of shares to be purchased. The effect of the amendment was to reduce the corporate borrowing by $60 million and concomitantly, to reduce the cash payout to stockholders from $480 million to $420 million. Under the plaintiff's damage theory the stock price should have increased when the Board decided to reduce the overall amount of borrowing, but (as the table shows) the opposite occurred. For this reason also the complaint does not allege facts that show a causal connection between the disclosure omissions and any alleged damage to the class.

## IV. CONCLUSION

The Board decisions under challenge here—to leverage the company and then distribute a substantial amount of cash to shareholders via a self-tender—are business decisions that are entitled to business judgment rule protection. Because the pleadings disclose no reason why under Delaware law the Samsonite Board should be deprived of that protection, the defendants' motion for judgment on the pleadings is granted, and the plaintiff's cross-motion is denied. IT IS SO ORDERED.

---

**26.** The Court may take judicial notice of the price of the Company's stock. *See e.g., SEC v. Bilzerian,* 814 F.Supp. 116, 123 (D.D.C.1993), aff'd 29 F.3d 689 (D.C.Cir.1994); *In re Delmarva Sec. Litig.,* 794 F.Supp. 1293, 1300 n. 5 (D.Del.1992).

**27.** The day the Offer commenced.

**28.** The day the Offer was amended to reduce the number of shares to be purchased from 12 million to 10.5 million.

**29.** The day the Offer terminated, and the Company accepted the shares for purchase.

**30.** As calculated in ¶ 5 of the complaint, ($40 + $12) ÷ 2 = $26.

Because all material facts were disclosed and the plaintiff was not injured, the plaintiff has also failed to state a claim for equitable fraud. *See NRG Barriers, Inc. v. Jelin,* Del. Ch., C.A. No. 15013, 1996 WL 451319 *6, mem. op. at 12–13, Steele, V.C. (Aug. 6, 1996) (holding that equitable fraud claim requires allegation of damages based on reliance on false representation or concealed material fact).