# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| | : | |
| IN RE TANGOE, INC. | : | **Consolidated** |
| STOCKHOLDERS LITIGATION | : | **C.A. No. 2017-0650-JRS** |
| | : | |

## MEMORANDUM OPINION

Date Submitted: August 27, 2018
Date Decided: November 20, 2018

Kurt M. Heyman, Esquire and Melissa N. Donimirski, Esquire of Heyman Enerio Gattuso & Hirzel LLP, Wilmington, Delaware; Jason M. Leviton, Esquire and Joel A. Fleming, Esquire of Block & Leviton LLP, Boston, Massachusetts; and Jeremy S. Friedman, Esquire, Spencer Oster, Esquire and David F.E. Tejtel, Esquire of Friedman Oster & Tejtel PLLC, New York, New York, Attorneys for Plaintiff.

Catherine G. Dearlove, Esquire and Sarah A. Galetta, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and William H. Paine, Esquire, Timothy J. Perla, Esquire, Peter A. Spaeth, Esquire and Alexander C. Boudreau, Esquire of Wilmer Cutler Pickering Hale and Dorr LLP, Boston, Massachusetts, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

There is no basis in our law to deny corporate fiduciaries the protection of the business judgment rule simply because they make risky decisions when the company is navigating stormy waters. Indeed, the evaluation and management of acute risk is "a core function of the exercise of business judgment."[1] But, when navigating a company through the storm, as always, fiduciaries must act first and foremost in the interests of the stockholders.

The storm analogy is apt in this case. The lead Plaintiff, a former stockholder of Tangoe, Inc. ("Tangoe" or the "Company"), alleges that former members of Tangoe's Board of Directors (the "Board") breached their fiduciary duties to Tangoe stockholders by steering the Company into an ill-advised take-private acquisition by TAMS Inc., Asentinel, LLC and Marlin Equity Partners (collectively, "Marlin").[2] According to Plaintiff, the members of Tangoe's Board (the "Director Defendants") recommended the transaction to stockholders in the midst of a storm conjured by the Board's false filings with the Securities and Exchange Commission ("SEC"), a failed effort to restate the Company's financials and correct the false filings, the subsequent

---

[1] *Asbestos Workers Local 42 Pens. Fund v. Bamman*, 2015 WL 2455469, at \*14 (Del. Ch. May 22, 2015).

[2] Two former Tangoe stockholders filed separate verified class action complaints. The Court granted motions to consolidate the complaints and appoint a lead plaintiff and lead counsel. That plaintiff, Matthew W. Sciabacucchi, filed the operative complaint following the receipt of documents in response to his books and records demand under 8 *Del. C.* § 220. Sciabacucchi Verified S'holder Class Action Compl. for Breach of Fiduciary Duty ("Compl."). *See* D.I. 34 (designating operative complaint).

1

delisting of the Company's stock by the NASDAQ exchange, the near deregistration of the stock by the SEC due to the Board's ongoing failure to file the restatement, rumblings of a proxy contest that threatened the Director Defendants' Board seats and, finally, the enticement of significant equity awards to the Director Defendants that would be triggered only by a change of control. Rather than navigate through or around the storm, according to Plaintiffs, the Director Defendants sailed Tangoe directly "into an iceberg and then faithlessly commandeered the lifeboats, leaving stockholders to drown."[3]

The storm clouds began to gather in March 2016, when Tangoe announced that the SEC had detected false statements in its publically filed financial statements and that the Company would have to restate its financials for 2013, 2014 and the first three quarters of 2015 (the "Restatement"). The announcement prompted a 10% drop in Tangoe's stock price. Soon after, as the stock price continued to decline, Marlin, a global private equity firm, filed a Schedule 13D disclosing that it beneficially owned 7.6% of Tangoe's common stock. Within months, Marlin increased its stake to 10.4%. This move, according to Plaintiffs, sent a clear signal to the Director Defendants—a proxy contest was coming.

---

[3] Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Answering Br.") 1 (D.I. 56).

As rumblings of a proxy fight grew more pronounced, the Company struggled to complete the Restatement. The delay, in turn, prompted NASDAQ to delist the Company's stock and the SEC to threaten deregistration. As the prospect of a successful Restatement began to fade, the Director Defendants confronted the reality that they would reap nothing from the Company's existing equity incentive plan because SEC rules barred the Company from making equity awards while the Restatement was pending. In the midst of this intensifying storm, the Board pivoted from completing the Restatement to selling the Company. At the same time, the Board created a new incentive plan for its members that would be triggered only upon a change of control.

The sales process unfolded as Tangoe's regulatory woes persisted. Marlin emerged as the most likely buyer. Its initial expression of interest was at $9 per share. By the time Tangoe's stock was delisted from NASDAQ, Marlin's offer had dropped to $6.50 per share (a 28% negative premium). Tangoe and Marlin announced the transaction—a tender offer at $6.50 per share followed by a second-step merger pursuant to 8 *Del. C.* § 251(h) ("the Transaction")—on April 28, 2017. Faced with the "Hobson's choice" of holding potentially illiquid stock or accepting an all-cash transaction, a majority of the Company's shareholders tendered at the

3

recommended price of $6.50 per share.[4]   The consideration represented a negative premium against every conceivable benchmark prior to Tangoe's delisting.

The Complaint pleads a single count against the Director Defendants for breaching their fiduciary duties by: (1) "agreeing to sell Tangoe to Marlin for an inadequate price, pursuant to an unreasonable process, while they were inadequately informed, ultimately failing to maximize stockholder value"; and (2) failing to "disclose to Plaintiff and the Class all information material to Tangoe stockholders' decision on whether to tender their shares and agree to the sale of the Company."[5]

The Director Defendants have moved to dismiss the Complaint.   Their showcase argument is that they are entitled to business judgment rule deference under *Corwin v. KKR Fin. Hldgs. LLC* because a majority of disinterested, fully informed and uncoerced stockholders approved the Transaction.[6]   Alternatively, they maintain that because Tangoe's certificate of incorporation contained a Section 102(b)(7) exculpatory provision, Plaintiff was obliged, but failed, to plead a non-exculpated claim for breach of the duty of loyalty.[7]

---

[4] Compl. ¶ 13.

[5] Compl. ¶¶ 132–37.

[6] Opening Br. in Supp. of Director Defs.' Mot. to Dismiss ("Director Defs.' Opening Br.") 1 (D.I. 50).  *See Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[7] *See* 8 *Del. C.* § 102(b)(7).

Plaintiff, not surprisingly, sees his Complaint in a different light. He argues that he has pled facts from which it may reasonably be inferred that stockholders were either coerced to tender or did so without the benefit of material information. Moreover, he maintains that he has pled facts to support a reasonably conceivable breach of the duty of loyalty claim that is not, as a matter of law, subject to Section 102(b)(7) exculpation.[8]

For reasons explained below, I conclude that *Corwin* "cleansing" is not available at the pleading stage because it is reasonably conceivable that the stockholders' approval of the transaction was uninformed. I also conclude that Plaintiff has adequately pled a non-exculpated claim for breach of the duty of loyalty against the Director Defendants because it is reasonably conceivable they approved the Transaction and recommended it to stockholders for self-interested reasons.

## I. BACKGROUND

I draw the facts from the allegations in the Complaint, documents incorporated by reference or integral to that pleading and judicially noticeable facts.[9]

---

[8] Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Answering Br.") 3 (D.I. 56).

[9] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint)); D.R.E. 201–02 (codifying Delaware's judicial notice doctrine).

As I must, I have accepted as true the Complaint's well-pled factual allegations and have drawn all reasonable inferences from those allegations in Plaintiff's favor.[10]

## A. The Parties and Relevant Non-Parties

Lead Plaintiff, Matthew Sciabacucchi, owned Tangoe common stock at all times relevant to the Complaint. He seeks to prosecute this action on behalf of himself and a class of all other similarly situated Tangoe stockholders.

Defendant, James Foy, joined the Board in March 2014 and was named Tango's "Acting CEO" on June 6, 2016. Defendant, Gerald Kokos, joined the Board in September 2002 and became its Executive Chairman on May 2, 2016. Both Foy and Kokos served on the Board through the consummation of the Transaction.

Plaintiff refers to the following Director Defendants as "Outside Directors,"[11] each of whom served on the Board until the consummation of the Transaction: Ronald Kaiser (who began serving on the Board in January 2009); Noah Walley (who began serving on the Board in July 2008); Jackie Kimzey (who began serving on the Board in March 2008); Richard Pontin (who began serving on the Board in March 2007); David Coit (who began serving on the Board in August 2006); and Gary Golding (who began serving on the Board in September 2002).

---

[10] *In re Gen. Motors S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[11] Compl. ¶ 28.

Non-party, Marlin Equity Partners, is a global private equity firm with over $6.7 billion of capital under management.[12]  Non-party, Asentinel, LLC ("Asentinel"), is a limited liability company organized under the laws of the State of Delaware, with its principal executive offices located in Memphis, Tennessee.[13] Asentinel is a portfolio company of Marlin Equity Partners and a provider of telecom expense management ("TEM") software and services.[14]  Following the Transaction, Marlin Equity Partners intended to combine Tangoe and Asentinel under the Tangoe brand, "creating a market leader managing more than $38 billion of [information technology] and telecom on behalf of over 1,300 customers worldwide."[15]

Prior to the Transaction, Tangoe was a Delaware corporation that provided information technology ("IT"), telecom expense management ("TEM") software and related services.  The Company's stock traded on the NASDAQ exchange until it was delisted on March 14, 2017.  Thereafter, the stock traded over-the-counter until the Transaction closed.

---

[12] Compl. ¶ 30.

[13] Compl. ¶ 31.

[14] *Id.*

[15] Compl. ¶ 84.

7

## B. Tangoe Before the Restatement

Tangoe was incorporated in 2000. It quickly emerged as a leading global provider of connection lifestyle management software and services to a wide range of blue chip global and non-global enterprises. The core of its business was its Matrix Solution Suite, "an on-demand suite of software designed to manage and optimize the complex processes and expenses associated with the complete lifestyle of an enterprise's connection assets and services."[16] "Between 2010 and 2014, the Company's year-over-year total revenue growth tripled from $68.5 million to $212.5 million."[17]

In late 2015, a number of Vector Capital IV, L.P. affiliates (collectively, "Vector") and Clearlake Capital Partners IV GP, L.P. affiliates (collectively, "Clearlake") made announcements that they had taken significant positions in Tangoe.[18] Their stated goal was to encourage the Board to consider strategic alternatives for Tangoe. When Vector approached the Board about a possible strategic transaction, the Board responded that it was not interested and would, instead, continue to pursue the Company's standalone plan.

---

[16] Compl. ¶ 28.

[17] *Id.*

[18] Compl. ¶ 36. Vector owned 9.9% of Tangoe; Clearlake owned 8.5%.

## C. The Restatement

On March 7, 2016, Tangoe announced that it had erroneously recognized $17.1 million of non-recurring revenue and, consequently, would need to restate its financial results for 2013, 2014 and the first three quarters of 2015. The Company reported that it did not expect to file its Form 10-K Annual Report on time but "would diligently pursue completion of the restatement as soon as reasonably practicable."[19]

Just one day after Tangoe announced the need for the Restatement, on March 8, 2016, Marlin acquired 3,001,426 shares of Tangoe common stock. About a week later, Marlin filed a Schedule 13D disclosing that its beneficial ownership position was approximately 7.6%. It also disclosed its interest in "potential business combinations and strategic alternatives" involving Tangoe.[20] On March 21, 2016, the Company announced it had received a NASDAQ notification letter in which Tangoe was admonished for failing to file its annual Form 10-K for the fiscal year ending December 31, 2015. Under the NASDAQ listing rules, Tangoe was required to submit a plan of compliance by May 20, 2016 or risk delisting.

---

[19] *Id.* (emphasis omitted).

[20] Compl. ¶ 34.

In April 2016, the Board engaged StoneTurn Group, LLP, a forensic accounting firm, to assist the Board and Tangoe's independent accounting firm, BDO USA, LLP ("BDO"), in the efforts to complete the Restatement. That same month the Board announced it had accepted the resignation of the Company's CFO and had appointed Jay Zager interim-CFO. Tangoe's co-founder, President, CEO and Chairman of the Board tendered his resignation soon after. To fill the void, the Board appointed Foy as interim-CEO and Kokos as Executive Chairman of the Board. According to Board presentation materials, on May 11, 2016, the Board verbally committed to "provide 'cash value' in [a change in control] scenario" to Foy and Kokos as compensation for their new roles.[21]

On May 16, 2016, four days before the NASDAQ plan of compliance was due, and with knowledge that Marlin intended either to "seek to cause [Tangoe] to implement various plans or proposals intended to enhance stockholder value" or to "engage in discussions" with Tangoe's Board about "potential business combinations and strategic alternatives,"[22] the Board formally retained Stifel, Nicolaus & Company, Inc. ("Stifel") to serve as Tangoe's financial advisor. The engagement contemplated that Stifel would conduct a strategic review process and

---

[21] Compl. ¶ 46.

[22] Compl. ¶ 34.

then pursue a sale of the Company. Indeed, under the terms of its engagement, Stifel's compensation was almost entirely contingent on a sale of Tangoe.[23]

**D. The Board Makes Preparations for a Sale**

On May 19, 2016, Tangoe received a NASDAQ deficiency notice for failure to file its 1Q16 Form 10-Q. Approximately two weeks later, on June 6, 2016, the Board named Foy Acting CEO in exchange for a salary of $50,000 per month, and $100,000 in Restricted Stock Units ("RSUs") under Tangoe's 2011 Stock Incentive Plan. This marked a 20-fold increase in Foy's annual salary.[24]

In a presentation delivered on June 15, 2016, Stifel advised the Board that Marlin had moved from simply "wanting a seat at the table" to an "intent to force a sale of Tangoe to itself."[25] In the same presentation materials, Stifel advised that Tangoe's recently resigned CEO, Subbloie, had engaged in sale discussions with Marlin. Stifel then questioned whether "a competitive process [could] be run given . . ." that a "former CEO with inside access [was] teaming with [Marlin]," creating a dynamic that was "wrought with disclosure issues and fair dealings."[26]

---

[23] Compl. ¶ 37. Stifel stood to earn $4,350,000 upon delivery of a fairness opinion and closing of a transaction, but only $300,000 and reimbursement for expenses if a transaction did not proceed past the evaluation stage. *Id.*

[24] Compl. ¶ 47.

[25] Compl. ¶ 38.

[26] Compl. ¶ 39.

Stifel closed its presentation by observing that "[e]ngaging in a sale of the company without projections or current financials increases barrier to entry."[27]

"On June 23, 2016, after Marlin and Tangoe had already engaged in preliminary acquisition discussions, Marlin purchased an additional 1,093,173 shares of Tangoe common stock, increasing its ownership interest to 10.4%."[28] A month later, on July 25, 2016, Tangoe received a letter from Vector in which Vector expressed its interest in taking Tangoe private. On the following day, Clearlake delivered a letter in which it shared its frustration with the Board's lack of progress in exploring a sale of the Company and requested that Tangoe enter into a non-disclosure agreement with Clearlake so it could make a competitive acquisition offer.[29]

As the sales overtures intensified, the Board turned its focus inwards. The Restatement had profoundly affected the Board's and management's compensation and incentives. Tangoe's 2011 Stock Incentive Plan provided substantial equity compensation for Tangoe officers and directors. Indeed, as depicted in the chart

---

[27] *Id.*

[28] Compl. ¶ 40.

[29] *Id.*

12

below, equity incentives comprised the bulk (approximately 75%) of the Individual Defendants' compensation for Board service:[30]

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($)(1) | Total ($) |
|---|---|---|---|
| David M. Coit | $ 35,000 | $ 122,500 | $ 157,500 |
| James D. Foy | 25,608 | 122,500 | 148,108 |
| Gary P. Golding | 38,125 | 122,500 | 160,625 |
| Ronald W. Kaiser | 48,751 | 122,500 | 171,251 |
| Jackie R. Kimzey | 35,000 | 122,500 | 157,500 |
| Gerald G. Kokos | 47,500 | 122,500 | 170,000 |
| Richard S. Pontin | 35,000 | 122,500 | 157,500 |
| Noah J. Walley | 38,126 | 122,500 | 160,626 |

Form S-8 barred the issuance of equity compensation under the 2011 Stock Incentive Plan while the Restatement was pending.[31]  Accordingly, on July 28, 2016, the Board caused the Company to enter into Equity Award Replacement Compensation Agreements ("EARCAs"), dated June 8, 2016, with each of the Director Defendants.  The EARCAs granted the Director Defendants Measurement Shares representing the number of Company RSUs, Company performance stock units or shares of restricted stock that would have been granted to each Board

---

[30] Compl. ¶ 49.

[31] Compl. ¶¶ 3, 50, 54.  *See also* 17 C.F.R. § 239.16b (requiring companies to file all required reports "during the preceding 12 months" to be eligible to issue equity awards registered under Form S-8).

member if the Form S-8 awards had been available. Specifically, under the EARCAs, each Director Defendant received 15,142 Measurement Shares, which would fully vest *only* upon a change in control.[32]

During the same meeting where the Director Defendants secured their EARCAs, the Board directed Stifel to explore a potential sale of Tangoe with a select group of acquirers, including Marlin, Clearlake and Vector. It is alleged that the common thread running through each of these financial sponsors was their willingness to consider a transaction regardless of whether Tangoe completed its Restatement and remained listed.[33]

On August 15, 2016, on the same day Tangoe entered into a confidentiality agreement with Marlin, the Board granted Foy and Zager an additional 400,000 and 100,000 Measurement Shares, respectively, with substantially similar terms as the previous EARCAs. These awards, however, conditioned 25% of the Measurement Shares on achieving an undisclosed deal price.[34]

### E. The Restatement Stalls as Sale Discussions Continue

In response to Tangoe's failure to file its 2Q16 Form 10-Q Quarterly Report, NASDAQ wrote the Company to advise the Board that Tangoe stock would be

---

[32] Compl. ¶ 56.

[33] Compl. ¶¶ 64, 72, 84.

[34] *Id.*

delisted if the Company did not comply with the Listing Rules by September 12, 2016. On August 19, 2016, Tangoe announced that it would not meet the already-extended September 12, 2016 deadline and would seek another extension. This prompted another letter from NASDAQ, this time from the exchange's Staff of the Listing Qualifications Department. This letter advised Tangoe that due to its failure to file timely Quarterly and Annual Reports, the Exchange would delist the Company's stock on September 22, 2016, and would thereafter file a Form 25-NSE with the SEC if Tangoe did not appeal the delisting decision.[35] Without any explanation for the delay, Tangoe informed its stockholders that it intended to request an appeal hearing.

Over the following week and a half, several suitors that had emerged in the sales process indicated their "concern with the lack of audited financial statements" and a "reluctance to pursue further discussions."[36] Marlin, however, was not deterred. On September 28, 2016, it communicated its interest in acquiring Tangoe at a price in the range of $8.25 to $8.50 per share. Tangoe's stock price closed at $8.17 that same day.

---

[35] *Id.* Form 25-NSE is used to notify the SEC that a security has been delisted which typically prompts deregistration of the securities by the SEC. *See* U.S. Sec. & Exch. Comm'n, *Form 25*, https://www.sec.gov/files/form25.pdf; D.R.E. 201(b).

[36] Compl. ¶ 68.

The list of interested financial sponsors grew smaller through October 2016. Marlin, however, remained engaged and, on November 4, 2016, informed Tangoe that it was prepared to propose a transaction at $9.00 per share—a 9.3% premium to the current trading price. On November 9, 2016, NASDAQ granted one final extension for Tangoe to complete the Restatement and allowed that Tangoe's common stock would continue trading on the NASDAQ exchange through March 10, 2017.[37]

On November 10, 2016, Tangoe filed a Form 12b-25 informing the SEC that it was unable timely to file its 3Q16 Form 10-Q.[38] This disclosure informed stockholders, however, that the Audit Committee had "substantially completed" its "internal investigation [and] internal review of the financial statements for the periods being restated."[39] Unbeknownst to stockholders, the investigation revealed that the Company actually recognized $30.5 million in revenue incorrectly and that the Company needed to make substantial adjustments to operating income.

Stifel's engagement with six potential strategic buyers later that month yielded no interest. The feedback was consistent; there could be no meaningful engagement with the Company while the Restatement remained incomplete. The

---

[37] Compl. ¶ 54.

[38] Compl. ¶ 55. *See also* Galetta Aff., Ex. M.

[39] Compl ¶ 75.

Board was not moved. It diverted focus and resources from the Restatement process and fixed its sights on Board compensation and a quick deal with any of the financial sponsors who were willing to look past the Restatement delays. On November 18, 2016, Director Defendants Coit, Pontin and Kaiser received additional EARCAs—1,225 Measurement Shares (valued at $20,000) to each Coit and Pontin, and 12,255 Measurement Shares (valued at $100,000) to Kaiser. Also on November 18, 2016, the Board approved accelerated vesting upon a change in control for senior management with at least 9,500 unvested RSUs, and extended the change in control deadlines to March 15, 2018 for both Foy's and Zager's EARCAs. As the Board was enhancing its compensation, Stifel was continuing its discussions with Marlin, Clearlake and Vector, the only potential acquirers that remained interested in Tangoe.[40]

On December 16, 2016, the Board learned that StoneTurn provided BDO with the final piece of information BDO needed *from StoneTurn* to complete audit sampling for the Restatement. Yet, as reported in the minutes of the December 27,

_____

[40] Plaintiff alleges that the Board made these compensation decisions just as it decided to deny stockholders an opportunity to make a change at the ballot box. Specifically, it is alleged that although Tangoe had not held an annual stockholders since June 4, 2015, on December 14, 2016, the Board determined not to hold the annual meeting for fiscal year 2016. This was significant since the Board terms of Director Defendants Coit, Kimzey and Walley were set to expire at the 2016 annual meeting. Compl. ¶ 77 ("Seeing a light at the end of the tunnel for themselves, the Board refused to hold an annual meeting in hopes of finalizing a sale before any adverse action could be taken against them by their displeased stockholders.").

17

2016 Audit Committee meeting, for reasons unclear, BDO never received the data it needed *from the Company* to complete the Restatement process. Instead, it appears that, by this point, the Board's focus was fixed on selling the Company.

Shortly after the December 27, 2016 Board meeting, Marlin provided an indication of interest in acquiring Tangoe for $7.50 per share, conditioned upon, among other things, the receipt of a quality of earnings report. Unlike its approach to the Restatement, the Board was quick to respond to Marlin's requests. On December 28, 2016, the Board commissioned Alvarez & Marsal, LLC ("A&M") to prepare a quality of earnings report for Marlin. Despite the materiality of a quality of earnings report in Marlin's eyes, the Board elected never to disclose that report to, or summarize its findings for the benefit of, the other stockholders.

During a telephone Board meeting on December 28, 2016, the Audit Committee reported that "progress on the Restatement was not sufficient for the Audit Committee to conclude with any degree of reliability that the Restatement would be completed" by NASDAQ's March 10 delisting deadline. Without explanation, on January 3, 2017, the Company notified NASDAQ of its anticipated non-compliance and then, that same day, advised stockholders that NASDAQ could "determine to suspend the Company's common stock from trading . . . at any time

18

and to delist the Company's common stock . . . upon making the required filing with the SEC."[41]

## F. Delisting, Lower Forecasts and Marlin's Final Discounted Proposal

At the same time it disclosed the likely delisting, Tangoe announced that Marlin proposed an acquisition of the Company for $7.50 per share, all cash—a 4.9% premium over Tangoe's then-prevailing unaffected trading price. The Company also publicly disclosed that Clearlake and Vector had proposed to acquire Tangoe for $7.00 per share (an 11% discount). In response to its request for additional diligence items, Director Defendants Foy, Kokos and Zager provided Marlin with updates on Tangoe's financial results for 2016 and lowered financial projections for 2017 in light of the 2016 results. Over the following weeks, additional financial sponsors approached the Company but declined to make a proposal after conducting due diligence.

Early 2017 saw steady declines in Tangoe's stock price. Between January 3, 2017, when the Company publicly announced that it would not meet the March 10, 2017 delisting deadline, and February 24, 2017, the last trading day before formal acquisition proposals were due, Tangoe's stock price declined from a high of $8.32 per share to a closing price of $6.01 per share. Even as the stock price declined, the

---

[41] Compl. ¶ 84.

Board's focus was on Board and executive compensation. And so, on February 2, 2017, the Board approved amendments to Foy's and Zager's EARCAs, "lowering the minimum threshold" consideration necessary to trigger vesting.

On February 27, 2017, Marlin submitted a revised and final proposal to acquire the Company at $6.50 per share cash. This offer marked more than a 13% decline from Marlin's initial proposal. The following week, on March 8, Stifel informed the Board that Vector and Clearlake would not make an acquisition proposal greater than $6.50 per share.[42] Notably, the minutes for the same Board meeting reveal that "management informed the Board that the Company's executive management team unanimously believe[d] the Company ha[d] reasonable prospects to continue operations on a standalone basis should the board decide that is the best course of action."[43]

As predicted, on March 10, 2017, Tangoe announced that its stock had been delisted from the NASDAQ exchange. In the same announcement, the Company reported that it was continuing to work "diligently" toward completing the Restatement.[44]

---

[42] Compl. ¶ 92.

[43] Compl. ¶ 96.

[44] Compl. ¶ 94.

On March 14, 2017, Tangoe shares began trading over-the-counter. That same day, Marlin and Tangoe executed an exclusivity agreement. On March 23, 2017, ostensibly in response to the stock's recent delisting, the Board received a letter from certain stockholders representing approximately 4% of Tangoe's common stock, threatening that, absent a prompt transaction, they would seek to replace the Board with "new directors."[45] The letter also urged Tangoe to hold its first annual stockholders meeting in nearly two years and warned that activists were "more than willing to pursue any legal remedies necessary to force" Tangoe to do so.[46] The Board received similar correspondence from another group of stockholders representing over 3% of Tangoe's common stock on March 28 and 29, 2017.[47]

## G. The Board Recommendation and Stockholder Approval

On April 27, 2017, the Board approved the Transaction at $6.50 per share. In doing so, the Board triggered the Director Defendants' right to receive collectively nearly $5 million in exchange for their Measurement Shares under the EARCAs. Marlin and Tangoe executed the Merger Agreement the following day and thereafter commenced a 30-day go-shop period pursuant to that Agreement. Despite Stifel

---

[45] Compl. ¶ 97.

[46] *Id.*

[47] Compl. ¶ 98.

actively shopping the Company to thirty-six parties during the go-shop, not a single serious overture or alternative acquisition proposal was submitted.

Tangoe filed the 14D-9 and accompanying Form 8-K to stockholders recommending the Transaction on May 12, 2017.[48] By letter dated June 5, 2017, before the Tender Offer closed, the SEC advised Foy that it had "significant concerns as to whether investors have access to the financial information necessary to make a decision regarding the [Tender] Offer," particularly since Tangoe had not provided any audited financial statements. Undeterred, the Board pressed forward and the Transaction closed on June 15, 2017, with 31,235,983 shares, or 78.2% of Tangoe's outstanding common stock, tendering into the deal.

### H. Procedural Posture

The Court entered a consolidation order on October 5, 2017. Plaintiff Sciabacucchi was designated Lead Plaintiff on November 14, 2017. Originally, the Sciabacucchi Complaint asserted an aiding and abetting claim against Marlin but Plaintiff voluntarily dismissed that claim without prejudice on March 14, 2018. The Director Defendants moved to dismiss the Consolidated Action on January 17, 2018.

---

[48] Galetta Aff., Ex. N.

## II. ANALYSIS

The Director Defendants seek dismissal on two principal grounds. First, they contend that any breach of fiduciary duty has been "cleansed" by the fully informed, uncoerced stockholder approval of the Transaction and, therefore, the applicable standard of review is the business judgment rule. If the Court were to agree, the only claim that might survive dismissal is a waste claim, which Plaintiff has not pled. Second, the Director Defendants argue that Plaintiff's claim is subject to the Section 102(b)(7) exculpatory provision in Tangoe's certificate of incorporation.

I begin by addressing the Director Defendants' *Corwin* defense. Because I find Plaintiff has pled facts that allow a reasonable inference that stockholder approval of the Transaction was uninformed, pleading-stage business judgment deference is not appropriate. As for the Director Defendants' argument that Plaintiff has failed to plead a non-exculpated claim, here again, I disagree. The Complaint pleads facts that support a reasonably conceivable claim that the Individual Defendants approved and recommended the Transaction for reasons other than the best interests of Tangoe stockholders. I explain my findings below.

The standards governing this motion to dismiss for failure to state a claim are well settled. The Court must read the complaint generously, accept all well-pled allegations contained therein as true, and draw all reasonable inferences in the light

23

most favorable to the non-moving party.[49] "Dismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[50] With that said, when deciding a motion to dismiss, the trial court is not required to accept as true conclusory allegations "without specific supporting factual allegations."[51]

## A. The *Corwin* Doctrine

In *Corwin v. KKR Fin. Hldgs. LLC*,[52] our Supreme Court held that when a "transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies."[53] This seminal holding, extending business judgment rule deference to pleading-stage determinations regarding the adequacy of fiduciary breach claims, reflects Delaware's "long-standing policy . . . to avoid the uncertainties and costs of judicial second-guessing when the disinterested stockholders have had the free and

---

[49] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 168.

[50] *Id.* (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[51] *Santa Fe Pac. Corp.*, 669 A.2d at 65–66.

[52] 125 A.3d 304 (Del. 2015).

[53] *Id.* at 309. *See also In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 750 (Del. Ch. 2016), *aff'd*, 156 A.3d 697 (Del. 2017) (TABLE) (concluding "the acceptance of a first-step tender offer by fully informed, disinterested, uncoerced stockholders representing a majority of a corporation's outstanding shares in a two-step merger under Section 251(h) has the same cleansing effect under *Corwin* as a vote in favor of a merger by a fully informed, disinterested, uncoerced stockholder majority.").

informed chance to decide on the economic merits of a transaction for themselves."[54]

This so-called *Corwin* doctrine will apply, however, only "to fully informed, uncoerced stockholder votes, and if troubling facts regarding director behavior were not disclosed that would have been material to a voting stockholder, then the business judgment rule is not invoked."[55]

In this case, Plaintiff does not dispute that the majority of Tangoe's disinterested stockholders tendered their shares and thereby approved the Transaction. The inquiry, then, turns to whether Plaintiff has pled facts from which the Court might reasonably conceive that the approval was not fully informed or was coerced.[56] If yes, *Corwin* will not apply, the business judgment rule will not be available to the Director Defendants at the pleading stage, and enhanced scrutiny or entire fairness will be the standard of review. If no, the Motion to Dismiss must be granted because the business judgment rule becomes the *de jure* standard of review and Plaintiff has not alleged waste.[57]

---

[54] *Corwin*, 125 A.3d at 313.

[55] *Id.* at 312.

[56] *See In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *7 (Del. Ch. Jan. 5, 2017) (holding that in the *Corwin* context, a plaintiff must plead facts that allow a reasonable inference that the stockholder vote was not informed).

[57] *See Singh v. Attenborough*, 137 A.3d 151, 151–52 (Del. 2016) ("When the business judgment rule standard of review is invoked because of a vote, dismissal is typically the result. That is because the vestigial waste exception has long had little real-world relevance, because it has been understood that stockholders would be unlikely to approve

## B. Plaintiff Has Adequately Pled that the Stockholder Vote Was Not Fully Informed

In response to a motion to dismiss in which the defendant has raised a *Corwin* defense, the "plaintiff challenging the decision to approve a transaction must first identify a deficiency in the operative disclosure document, at which point the burden would fall to defendants to establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of th[e] vote."[58] In this regard, Delaware law requires directors to "disclose fully and fairly all material information within the board's control" when soliciting stockholder action.[59] This obligation of disclosure extends only to information that is material,[60] and information is material when "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[61] Stated differently, a disclosure is material only

---

a transaction that is wasteful.") (citations omitted); *Volcano Corp.*, 143 A.3d at 750 ("Because Volcano's fully informed, uncoerced, disinterested stockholders approved the Merger by tendering a majority of the Company's outstanding shares into the Tender Offer, the business judgment rule . . . applies. The Merger, therefore, only can be challenged on the basis that it constituted waste.").

[58] *Solera Hldgs.*, 2017 WL 57839, at *7–8.

[59] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

[60] *In re Merge Healthcare Inc. S'holders Litig.*, 2017 WL 395981, at *9 (Del. Ch. Jan. 30, 2017) ("'Fully informed' does not mean infinitely informed, however.").

[61] *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *8 (Del. Ch. Mar. 31, 2017) (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

if it "significantly alter[s] the 'total mix' of information made available" to the stockholders.[62]

Plaintiff has alleged four subject areas where the Company's disclosures regarding the Transaction omitted material facts: (1) the failure to provide Tangoe stockholders with audited financial statements; (2) the failure to disclose whether (or when) the Restatement would be completed; (3) the failure to disclose that the Director Defendants were actively interfering with the Restatement process; and (4) the failure to disclose the projected costs of completing the Restatement. Of these alleged material omissions, I find the following have been well-pled—the failure to provide audited financials and the failure to provide details regarding the status of the Restatement. I address each below.

### 1. Failure to Provide Audited Financial Statements

According to Plaintiff, it is not surprising the SEC expressed "significant concerns as to whether investors have access to the financial information necessary to make a decision regarding the Offer"—i.e., audited financial statements for fiscal years 2013 through 2016.[63] It is also not surprising, according to Plaintiff, that the Director Defendants chose not to mention the SEC's expressed concerns regarding

---

[62] *Arnold v. Soc'y for Sav. Bancorp*, 650 A.2d 1270, 1277 (Del. 1994).

[63] Compl. ¶¶ 12, 122.

the Board's failure to provide stockholders with material information in their Opening Brief in support of the motion to dismiss. The Director Defendants respond that Plaintiff makes too much of the SEC letter and note that, in numerous public filings, Tangoe did disclose that the process of preparing audited financials was "ongoing."[64] Moreover, they argue that if a stockholder wanted to know implied share values, that information could be calculated with simple arithmetic based on available information—"multiply the identified multiples by Tangoe's revenue or EBITDA as applicable and then divide that by Tangoe's share count."[65]

While it is true Schedule 14D-9 does not require audited financials, and our law by no means deems audited financials material *per se*,[66] under the circumstances alleged here, it is reasonably conceivable that a reasonable stockholder would have deemed audited financials important when deciding whether to approve the Transaction. Throughout the uncertainties surrounding the Restatement, the financial information the Board provided to stockholders was sporadic and heavily

---

[64] *See* Galetta Aff. Exs. D at 8 (Apr. 25, 2016 Form 8-K) (noting that internal review "was continuing"), H at 3 (Aug. 10, 2016 Form 12b-25) (estimating completing internal review by early in the fourth quarter of 2016), J at 3 (Nov. 10, 2016 Form 12b-25) (announcing internal review was "substantially complete" and that the audit of the Company's restated year-end financial statements was ongoing).

[65] Director Defs.' Opening Br. 22.

[66] *See Brody v. Zaucha*, 697 A.2d 749, 755 (Del. 1997) (holding that consent solicitation was not *per se* invalid because it occurred before the company's audited financials were available for disclosure to stockholders).

28

qualified.  Indeed, the Board cautioned stockholders that the unaudited financials: (1) "are preliminary"; (2) "have not been prepared in conformity with [U.S. GAAP]"; (3) were "anticipate[d]" to "require further adjustment in connection with the Restatement"; and (4) "have not been reviewed by the Company's independent registered public accounting firm and remain subject to adjustment arising out of such review."[67]  To address some of that uncertainty, and to address concerns expressed by several potential bidders regarding Tangoe's turbid financial picture,[68] the Board engaged A&M to prepare a quality of earnings report.  Yet the Board elected not to disclose that report to the public stockholders.[69]  This information vacuum, compounded by the fact that the Company had failed to file multiple 2016 quarterly reports and had not held an annual stockholders meeting for nearly three years,[70] supports a reasonable inference that stockholder approval of the Transaction was not fully informed in the absence of adequate financial information about the Company and its value.

---

[67] Galetta Aff., Ex. O (Form 8-K dated May 11, 2017) at 2.

[68] Compl. ¶¶ 83, 92.

[69] Compl. ¶¶ 82–83.

[70] Compl. ¶¶ 39, 42, 50, 60.

## 2. The Failure to Explain the Restatement to Stockholders

Plaintiff maintains that the Board was obliged to take special care to explain to stockholders what was happening with the Restatement given the NASDQ delisting and threatened SEC deregistration. According to Plaintiff, even setting aside any self-interest (e.g., the threatened proxy fight and the desire to trigger the EARCAs) that might have motivated the Director Defendants to push the Transaction onto the stockholders, the fact that the Board failed to provide robust disclosures regarding the Restatement, standing alone, provides a basis to deny *Corwin* cleansing to the Director Defendants. In response, the Director Defendants say that they could not tell stockholders what they, themselves, did not know.[71] In disclosure parlance, the Director Defendants insist they owed no "duty to make a prediction."[72]

All constituencies—including potential bidders, stockholders and Board members—knew well that the Restatement stakes were high. NASDAQ had delisted the stock, the SEC was threatening deregistration and stockholder activists were expressing their growing frustration with the Board's inability to bail fast enough to save the sinking ship. Under these circumstances, the stockholders' need for

---

[71] Director Defs.' Opening Br. 5 (noting that the Company advised stockholders that "it could not estimate whether or when it would . . . issue restated financials.").

[72] *See, e.g.*, Oral Arg. on Defs.' Mot. to Dismiss Tr. ("Oral Arg. Tr.") 20:6–8, 20:17–19 (Aug. 27, 2018) (D.I. 66).

information regarding the Restatement was *ne plus ultra* when considering whether to tender into the Transaction. And yet, when deciding whether to tender their shares, Tangoe stockholders did not know whether the Company would ever complete the Restatement, let alone when.

The need to disclose this information was especially important given that the Board disclosed in a November 10, 2016, Form 12b-25 that "[t]he internal investigation overseen by the Audit Committee in connection with the restatement is substantially complete,"[73] and then confirmed that it had "substantially completed its internal review of the financial statements for the periods being restated and [that it was] working with the Company's independent registered public accounting firm as it audits the restated year-end financial statements."[74] And then, "on December 16, 2016, the Board was informed that StoneTurn provided BDO with the last piece of information it needed to complete audit sampling [and] was therefore fully aware that the forensic accounting was done and all that remained was BDO's formal audit."[75] In other words, the Board was aware that the forensic accounting was complete (or nearly complete) and that only BDO's formal audit remained. Yet the Board chose not to share this information with stockholders and, thus, deprived

---

[73] Galetta Aff., Ex. J.

[74] Compl. ¶ 75.

[75] Compl. ¶ 78.

them of the opportunity to consider whether to stay the course and allow the Restatement to proceed or whether to sell as the consequences of the unfinished Restatement were still unfolding.[76]

**********

Having determined Plaintiff has adequately pled that the Tangoe stockholders were not fully informed when they approved the Transaction, I need not consider whether their approval was also the product of coercion. While *Saba* likely foretells where that analysis would lead me, I decline to go there because further exegesis on the manner by which coercion will undermine the cleansing effect of stockholder

---

[76] The information about the Restatement process, which was in the Board's possession, was material because the delisting depressed the amount potential acquirers were willing to pay for Tangoe and stockholders needed to understand whether the delisting was likely to continue or whether the Company had a legitimate prospect of completing the Restatement and regaining its listed status with NASDAQ. *See Saba Software*, 2017 WL 1201108, at *12 (holding that information relating to the status of a stalled effort to complete a restatement of financials was material to stockholders' determination of whether to approve a proposed sale of the company). This disclosure would not have been the kind of "tell me why" disclosure that this court regularly finds immaterial and unnecessary. *See, e.g.*, *Solera Hldgs.*, 2017 WL 57839, at *12 (quoting *In re Sauer–Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1131 (Del. Ch. Apr. 29, 2011)). Rather, as Plaintiff correctly points out, the material information that was omitted from the disclosures at issue here were statements of facts—facts that spurred the sales process, facts that affected the intrinsic value of Tangoe and facts that allowed the Board meaningfully to assess when or if the temporarily disruptive state of the Company would pass. The fact that Tangoe management had reported to the Board that "the Company has reasonable prospects to continue operations on a standalone basis" as late as March 8, 2017, only enhances the materiality of full disclosure regarding the status of the Restatement.

approval under *Corwin* is unnecessary and there is little hortatory purpose to be served by simply restating what has already been said.[77]

**C. Plaintiff Has Pled a Non-Exculpated Claim for Breach of Fiduciary Duty**

Plaintiff alleges the Director Defendants breached their fiduciary duties in connection with the Transaction by "undermin[ing] the Restatement efforts [and] myopically focusing the Company's resources on securing a change-in-control transaction . . . which triggered significant payouts pursuant to their EARCAs, but severely undervalu[ing] Tangoe by forcing a sale at the nadir of its negotiating leverage."[78] In defense, the Director Defendants argue the Complaint fails to state a claim that can pass through the Section 102(b)(7) exculpatory clause in Tangoe's certificate of incorporation.[79]

---

[77] *See Saba Software*, 2017 WL 1201108, at *16 (explaining why calling a vote on the sale of the company in the midst of an unresolved restatement that had not been adequately explained to stockholders was "situationally coercive"); *Sciabacucucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *20 (Del. Ch. May 31, 2017) (explaining that "a structurally-coerced vote is simply a vote structured so that considerations extraneous to the transaction likely influenced the stockholder-voters, so that I cannot determine that the vote represents a stockholder decision that the challenged transaction is in the corporate interest.").

[78] Pl.'s Answering Br. 1.

[79] *See* 8 *Del. C.* § 102(b)(7). Tangoe's certificate of incorporation, of which I take judicial notice (*see McMillan*, 768 A.2d at 501 n.40 (holding that a court may take judicial notice of an exculpatory charter provision in resolving a motion addressed to the pleadings)), contains an exculpatory provision in Article VII: "A director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director to the fullest extent permitted by the General Corporation Law

In *In re Cornerstone Therapeutics Inc. S'holder Litig.*, our Supreme Court made clear that when a director is protected by an exculpatory charter provision, a plaintiff "must plead a non-exculpated claim for breach of fiduciary duty . . . or that director will be entitled to dismissal from the suit."[80] A "non-exculpated claim for breach of fiduciary duty," for purposes of Section 102(b)(7), means a well-pled claim for breach of the duty of loyalty (in any of its forms).[81] When a plaintiff seeks to hold multiple directors protected by an exculpatory provision liable for breach of fiduciary duty, that plaintiff must well-plead a loyalty breach against each individual director; so-called "group pleading" will not suffice.[82]

### 1. The EARCAs

"To plead a claim for breach of the duty of loyalty that will overcome a motion to dismiss, a plaintiff must plead sufficient facts to support a rational inference that the corporate fiduciary acted out of *material self-interest* that diverged from the

---

of the State of Delaware." Galetta Aff., Ex. A at 3 (Tangoe's Restated Cert. of Inc., Ex. 3.1 to Form 8-K dated Aug. 4, 2011).

[80] *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1179 (Del. 2015).

[81] *See Emerald P'rs v. Berlin*, 787 A.2d 85, 90 (Del. 2001) (citing *Malpiede*, 780 A.2d at 1095) ("The purpose of Section 102(b)(7) was to permit shareholders . . . to adopt a provision in the certificate of incorporation to exculpate directors from any personal liability for the payment of monetary damages for breaches of their duty of care, but not for duty of loyalty violations, good faith violations, and certain other conduct.")).

[82] *Cornerstone*, 115 A.3d at 1179.

interests of the shareholders."[83]  As pled, per Form S-8, the Director Defendants were unable to secure awards under Tangoe's existing equity incentive plan as long as the Restatement remained unfinished.  This prompted the Board to approve EARCAs that would vest on an accelerated basis upon a change in control.  Plaintiff alleges that the EARCAs incentivized the Director Defendants as beneficiaries of those awards to steer Tangoe into a sale of the company, not because a sale was in the best interests of stockholders, but because a sale was the most likely means by which the Director Defendants would receive generous Measurement Shares that approximated the generous equity awards they would have received if only the Company could complete the Restatement.[84]

The timing of the equity awards bolsters Plaintiff's theory of Director Defendant self-interest.  The EARCAs were approved soon after NASDAQ's deadline to earn regulatory compliance expired.[85]  Soon after that, on August 15,

---

[83] *Saba Software*, 2017 WL 1201108, at *21 *(citing Cede & Co v. Technicolor, Inc.*, 634 A.2d 345, 363–64 (Del. 1993)).

[84] Compl. ¶¶ 53–57, 83, 85.  The Director Defendants minimize Plaintiff's "incentives" argument with respect to the EARCAs by noting that "the EARCAs provided the same payout if the Company completed the restatement and *restored equity grants*." Director Defs.' Opening Br. 3.  Of course, this ignores the reasonable inference that flows from Plaintiff's well-pled allegations: the Company was struggling to complete the Restatement and there were real questions whether it would ever do so.  Indeed, Plaintiff alleges that the Board stopped trying to complete the Restatement once it became clear that a sale of the Company could be achieved.  Compl. ¶¶ 74–75, 79, 85.

[85] Compl. ¶¶ 50–51, 59, 115–117.

2016, Tangoe entered into a confidentiality agreement with Marlin, the Company received another non-compliance letter from NASDAQ and the Board granted Foy and Zager an additional 400,000 and 100,000 Measurement Shares, respectively. The timing of these events reasonably infer a temporal connection between the adoption of the EARCAs and the Board's decision to shift course toward an allegedly ill-advised sale of the Company.[86]

The EARCAs provided reasonably conceivable material benefits to the Director Defendants. Prior to the Restatement debacle, the Director Defendants' compensation was comprised primarily of equity awards. Those awards were increasingly chimerical as the unfinished Restatement wore on. Under the EARCAs, the Director Defendants collectively realized $5 million upon the Transaction's consummation:[87]

---

[86] *See In re K–Sea Trans. P'rs L.P. Unitholders Litig.*, 2011 WL 2410395, at *7 (Del. Ch. June 10, 2011) (noting that significant options granted to members of the committee tasked with evaluating a transaction close in time to the commencement of negotiations supported an inference that the members were interested in the transaction); *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *9 (Del. Ch. Nov. 30, 2007) (noting that "the acceleration of unvested options could be viewed as an inducement to effectuate" a merger, but determining the acceleration of options in that case was not significant enough to infer that the directors were interested in the transaction).

[87] Compl. ¶ 134 ("[T]he Director Defendants, who collectively pocketed an additional $5 million upon consummating the Transaction, did not face this Hobson's choice.").

| Director Defendant | Retention Agreement Compensation | "In The Money" Options Compensation[16] | EARCA Measurement Share Compensation | Total Compensation Received Due To A Change In Control |
|---|---|---|---|---|
| Foy | $892,140 | 0 | 2,600,000 | $3,492,140 |
| Kokos | 0 | $129,587 | $1,673,750 | $1,803,337 |
| Coit | 0 | 0 | $106,386 | $106,367 |
| Golding | 0 | 0 | $98,423 | $98,423 |
| Kaiser | 0 | 0 | $178,081 | $178,081 |
| Kimzey | 0 | 0 | $98,423 | $98,423 |
| Pontin | 0 | $337,904 | $106,386 | $444,290 |
| Walley | 0 | $42,262 | $98,423 | $140,685 |

Plaintiff is entitled to all reasonable inferences flowing from well-pled facts. With this in mind, it is reasonably conceivable that the EARCAs were material to each Director Defendant.

## 2. The Looming Proxy Contest

The EARCAs are not the only source of director conflict identified by Plaintiff. As the Company struggled to complete the Restatement, stockholders with sizable stakes in the Company, including Marlin, let their frustration be known to

the Board.[88]  Indeed, on March 23, 2017, the Company received a letter from certain stockholders representing approximately 4% of Tangoe's common stock, threatening that, absent a prompt transaction, they would seek to replace the Board with "new directors."[89]  A similar letter followed a week later from another stockholder group.  While our courts have expressed reluctance to find that business judgment rule deference is not available to directors simply because they operate under the threat of a proxy contest,[90] when coupled with other pled facts, including the Board's struggles to complete the Restatement, its adoption of the EARCAs and its recommendation to stockholders to accept steadily decreasing offers from Marlin (one of many agitated stockholders) to acquire the Company,[91] the allegations

---

[88] Compl. ¶¶ 4–5, 34, 77, 97, 98.

[89] Compl. ¶ 97.

[90] *See In re Lukens, Inc. S'holders Litig.*, 757 A.2d 720 (Del. Ch. 1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000) (TABLE); *In re OM Grp., Inc. S'holders Litig.*, 2016 WL 5929951 (Del. Ch. Oct. 12, 2016).

[91] I acknowledge the Director Defendants' repeated refrain that the Transaction brought Tangoe stockholders a 19.5% premium to the unaffected share price.  *See, e.g.*, Defs.' Opening Br. 1, 7, 32, 33.  Of course, the announcement of the Restatement resulted in a substantial decline in Tangoe's stock price from which it never recovered.  And Marlin's final offer of $6.50 per share, recommended to stockholders by the Board, reflected a 28% decline from Marlin's initial proposal.

38

regarding the looming proxy fight take on a greater measure of relevance at the

motion to dismiss stage.[92]

---

[92] *See In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 64-65 (Del. Ch. 2014), *aff'd sub nom. RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816 (Del. 2015) (finding in a post-trial opinion that that an outside director's interest in maintaining his professional reputation was a "selfish motive" that could constitute "personal circumstances that inclined [him] towards a near-term sale."); *Kosseff v. Ciocia*, 2006 WL 2337593, at *3 (Del. Ch. Aug. 3, 2006) (Master's Report) (Glasscock, M.) (finding that looming proxy fight, under the circumstances, supported a reasonable inference along with other pled facts that otherwise independent directors were "not disinterested"); *In re PLX Tech. Inc. S'holders Litig.*, C.A. No. 9880-VCL (Del. Ch. Sept. 3, 2015) (TRANSCRIPT) (holding that "facially independent and disinterested directors" were adequately alleged to have committed a non-exculpated breach of fiduciary duty where they had agreed to sell the company not "entirely because it was in the best interests of the stockholders" but, instead, at least in part because an activist stockholder had pressured them into a sale through a control contest that involved a proxy fight and appointment of three new directors to the board before the sale was agreed to). These holdings are supported by empirical evidence that directors who face a proxy contest suffer tangible harm to their professional reputations and, as a result, their pocketbooks. In a 2013 paper, professors from the University of Chicago and the University of Illinois at Urbana-Champaign found that corporate directors experience a significant decline in directorship opportunities following a proxy contest:

> We show that ***proxy contests are associated with significant adverse effects on the careers of incumbent directors***: following a proxy contest, incumbents lose seats not only on targeted boards, but also on other unrelated boards. For example, facing a direct threat of removal is associated with losing more than one board seat over the following three years, which corresponds to more than ***$1.3 million in foregone income for the average incumbent director***. The results are robust when we account for director time-invariant characteristics, firm time-varying characteristics, and also when we hold firm and director matches constant. Therefore, the proxy-contest mechanism is effective in imposing significant career costs on incumbent directors.

Vyacheslav Fos & Margarita Tsoutsoura, *Shareholder Democracy in Play: Career Consequences of Proxy Contests*, at 31–32, Journal of Financial Economics, Volume 114, Issue 2 (October 21, 2013), *available at* http://ssrn.com/abstract=2293953. *See also* Randall S. Thomas & Patrick C. Tricker, *Confronting New Market Realities: Implications for Stockholder Rights to Vote, Sell, and Sue*, 70 Okla. L. Rev. 9, 33 (2017) (finding that

## III. CONCLUSION

Based on the foregoing, I am satisfied that *Corwin* cleansing is not available and that Plaintiff has adequately pled a claim for breach of the fiduciary duty of loyalty against the Director Defendants. One might discern from these findings, and the similar finding in *Saba*, that directors simply cannot achieve business judgment rule deference when they make difficult decisions amid a "regulatory storm" (e.g., a mandated restatement of the company's financial disclosures). That would be a shallow reading of what has been said here. The business judgment rule protects directors in good times and in bad. But, to earn pleading-stage business judgment deference by invoking stockholder approval of a challenged transaction, the directors must demonstrate that they carefully and thoroughly explained all material aspects of the storm to stockholders—how the company sailed into the storm, how the company has been affected by the storm, what alternative courses the company can take to sail out of the storm and the bases for the board's recommendation that a sale of the company is the best course. Extraordinary transactions proposed to stockholders in the midst of extraordinary times must be explained with

---

"[p]roxy contests also hurt a director's tenure at other companies."); *Chen v. Howard-Anderson*, 87 A.3d 648, (Del. Ch. 2014) ("Greed is not the only human emotion that can pull one from the path of propriety; so might hatred, lust, envy, revenge, . . . shame or pride. Indeed any human emotion may cause a director to place his own interests, preferences or appetites before the welfare of the corporation.").

commensurate care. And, of course, in trying times, the directors must remain focused on the best interests of stockholders, not their own interests.

The Director Defendants may ultimately demonstrate that they discharged their duty of full disclosure and discharged their duty of loyalty in recommending the Transaction to Tangoe stockholders. At this pleading stage, however, Plaintiff has stated a viable breach of fiduciary claim and is entitled to take discovery to support it. Accordingly, the Motion to Dismiss must be **DENIED**.

**IT IS SO ORDERED.**